UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JENNIFER K. HOLLINGER, | ) | CIVIL ACTION NO. 4:20-CV-1133 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| KILOLO KIJAKAZI,[1] | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

### I.    INTRODUCTION

Plaintiff Jennifer Hollinger, an adult individual who resides within the Middle District of Pennsylvania, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act. Jurisdiction is conferred on this Court pursuant to 42 U.S.C. §405(g).

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.  She is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d) (providing that when a public officer sued in his or her official capacity ceases to hold office while the action is pending, "the officer's successor is automatically substituted as a party."); s*ee also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

This matter is before me, upon consent of the parties pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. After reviewing the parties' briefs, the Commissioner's final decision, and the relevant portions of the certified administrative transcript, I find the Commissioner's final decision is supported by substantial evidence. Accordingly, the Commissioner's final decision will be AFFIRMED.

## II.     BACKGROUND & PROCEDURAL HISTORY

On October 17, 2017, Plaintiff protectively filed an application for disability insurance benefits under Title II of the Social Security Act. (Admin. Tr. 10; Doc. 13-2, p. 11).  In this application, Plaintiff alleged she became disabled as of February 20, 2017, when she was forty-five years old, due to the following conditions: bipolar I; PTSD; depression; anxiety; HTN; and thyroid condition. (Admin. Tr. 170; Doc. 13-6, p. 11). Plaintiff alleges that the combination of these conditions affects her ability to walk, remember, and concentrate. (Admin. Tr. 182; Doc. 13-6, p. 23). Plaintiff has at least a high school education. (Admin. Tr. 22; Doc. 13-2, p. 23). Before the onset of her impairments, Plaintiff worked as a project coordinator, customer service manager, customer service representative, accounting clerk, and service dispatcher. (Admin. Tr. 22; Doc. 13-2, p. 23).

On January 19, 2018, Plaintiff's application was denied at the initial level of administrative review. (Admin. Tr. 10; Doc. 13-2, p. 11). On February 9, 2018, Plaintiff requested an administrative hearing. *Id.*

On February 26, 2019, Plaintiff, assisted by her counsel, appeared, and testified during a hearing before Administrative Law Judge Lawrence J. Neary (the "ALJ"). *Id*. On April 17, 2019, the ALJ issued a decision denying Plaintiff's application for benefits. (Admin. Tr. 23; Doc. 13-2, p. 24). On April 25, 2019, Plaintiff requested review of the ALJ's decision by the Appeals Council of the Office of Disability Adjudication and Review ("Appeals Council"). (Admin. Tr. 146; Doc. 13-4, p. 74).

On June 1, 2020, the Appeals Council denied Plaintiff's request for review. (Admin. Tr. 1; Doc. 13-2, p. 2).

On July 2, 2020, Plaintiff initiated this action by filing a Complaint. (Doc. 1). In the Complaint, Plaintiff alleges that the ALJ's decision denying the application is not supported by substantial evidence, and improperly applies the relevant law and regulations. *Id*. As relief, Plaintiff requests that the Court enter an order awarding benefits. *Id.*

On January 11, 2021, the Commissioner filed an Answer. (Doc. 12). In the Answer, the Commissioner maintains that the decision holding that Plaintiff is not

entitled to disability insurance benefits was made in accordance with the law and regulations and is supported by substantial evidence. *Id*. Along with her Answer, the Commissioner filed a certified transcript of the administrative record. (Doc. 13).

Plaintiff's Brief (Doc. 14), the Commissioner's Brief (Doc. 16), and Plaintiff's Reply (Doc. 17) have been filed.  This matter is now ripe for decision.

III.   STANDARDS OF REVIEW

Before looking at the merits of this case, it is helpful to restate the legal principles governing Social Security Appeals.

A.   SUBSTANTIAL EVIDENCE REVIEW – THE ROLE OF THIS COURT

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not

substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

"In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). The question before this Court, therefore, is not whether Plaintiff is disabled, but whether the Commissioner's finding that Plaintiff is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope

of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

B.   STANDARDS GOVERNING THE ALJ'S APPLICATION OF THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a).[2] To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).

---

[2] Throughout this Report, I cite to the version of the administrative rulings and regulations that were in effect on the date the Commissioner's final decision was issued. In this case, the ALJ's decision, which serves as the final decision of the Commissioner, was issued on April 17, 2019.

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. § 404.1545(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 404.1512; *Mason*, 994 F.2d at 1064.  Once this burden has been met by

the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. § 404.1512(b)(3); *Mason*, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Id.* at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999).

IV.    DISCUSSION

Plaintiff raises the following issues in her statement of errors:

ERROR 1: The ALJ failed to find very persuasive the opinions of long-standing psychiatrist, L. Alida Covaci, M.D., as well as that of therapist Debra L. Francis-Werner, MSW, LCSW.

ERROR 2: The ALJ incorrectly concluded that Claimant can perform a full range of work at all exertional levels for the durational period, and thus can engage in substantial gainful activity because such a determination lacks substantial evidentiary support in the Record.

(Doc. 14, p. 3).

A.   THE ALJ'S DECISION DENYING PLAINTIFF'S APPLICATION

In his April 2019 decision, the ALJ found that Plaintiff would meet the insured status requirement of Title II of the Social Security Act through December 31, 2022. (Admin. Tr. 12; Doc. 13-2, p. 3). Then, Plaintiff's application was evaluated at steps one through five of the sequential evaluation process.

At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity at any point between February 20, 2017 (Plaintiff's alleged onset date) and April 17, 2019 (the date the ALJ decision was issued) ("the relevant period"). *Id.* At step two, the ALJ found that, during the relevant period, Plaintiff had the following medically determinable severe impairments: post-traumatic stress disorder (PTSD); depressive disorder; anxiety disorder; and bipolar disorder. (Admin. Tr. 12; Doc. 13-2, p. 13). The ALJ also identified the following medically determinable non-severe impairments: hypertension; asthma hypothyroidism; and obesity. (Admin. Tr. 12-13; Doc. 13-2, pp. 13-14). At step three, the ALJ found that, during the relevant period, Plaintiff did not have an impairment or combination of impairments that met

or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Admin. Tr. 13; Doc. 13-2, p. 14).

Between steps three and four, the ALJ assessed Plaintiff's RFC. The ALJ found that, during the relevant period, Plaintiff retained the RFC to engage in  work at all exertional levels defined in 20 C.F.R. § 404.1567 except that she is:

> limited to simple, routine tasks, with only occasional changes in the work setting, no interaction with the public and not and only occasional interaction with the supervisors and co-workers.

(Admin. Tr. 16; Doc. 13-2, p. 17) (typographical errors in original).

At step four, the ALJ found that, during the relevant period, Plaintiff could not engage in her past relevant work. (Admin. Tr. 21; Doc. 13-2, p. 22). At step five, the ALJ found that, considering Plaintiff's age, education and work experience, Plaintiff could engage in other work that existed in the national economy. (Admin. Tr. 22-23; Doc. 13-2, pp. 23-24). To support his conclusion, the ALJ relied on testimony given by a vocational expert during Plaintiff's administrative hearing and cited the following four (4) representative occupations: laundry laborer, DOT #361.687-018; cleaner/housekeeper, DOT #323.687-014; and bakery worker conveyor line, DOT #524.687-022; and final assembler optical goods, DOT #713.687-018. *Id*.

B.    WHETHER THE ALJ PROPERLY EVALUATED PLAINTIFF'S STATEMENTS
      RECORDED IN MEDICAL RECORDS ABOUT HER SYMPTOMS & THE
      OPINIONS THAT ARE CONSISTENT WITH THOSE STATEMENTS

Plaintiff argues that the ALJ's decision to discount a medical opinion co-authored by two mental health providers, and Plaintiff's statements about her own symptoms, is not supported by substantial evidence because the ALJ incorrectly concluded that the opinion and statements were inconsistent with Plaintiff's treatment records.

The ALJ provided the following summary of the treatment records at issue in his decision:

> The claimant completed self-reporting Mood Charts from October 2016 through January 2018 as part of her therapy. It was noted at the beginning of the charts that "Long term monitoring is valuable in bipolar disorder to facilitate recognition of the variability in the mood swings associated with the condition, including identification of symptom-free intervals" (Exhibit 5F/2). Symptoms were reported on a range of 0 (none) to 3 (high). In June 2017, she reported "low mood" at a level of 3 on 4 days, with no "high mood" days at level 3. She reported anxiety at level 3 on 7 days, three of which were days when her husband was out of town (Exhibit 5F/12). In October 2017, she reported low mood of 3 on 3 days, but anxiety at a level 3 on 21 days (Exhibit 5F/11). In December 2017, she reported high mood at level 3 on 4 days, no days of low mood above level 2, and anxiety at a level 3 on 11 days. Notably, in September 2018, she reported no days at level three, very few at level 2, and 22 days of anxiety at level 0 (zero). When asked about this at the hearing, she testified her medication had been increased the month before.
>
> In March 2017, the claimant presented to a doctor for a mole on her back that her husband said may have gotten larger (Exhibit 2F/7). She

was unaccompanied. Review of Systems was all otherwise negative, including psychiatric. She was alert and fully oriented, with normal mood and affect. Her behavior was normal, as was her judgment and thought content. She was in no distress.

On April 5, 2017, it was noted that the claimant had adjusted to the care and companionship of her therapy dog and had chosen to engage in more activities outside of her home (Exhibit 9F/53). She had lost her job but was "currently transitioning to a new role in her husband's company."

On April 29, 2017, the claimant reported, "I'm doing pretty well" (Exhibit 9F/29). On June 15, 2017, she said she was "Better for the most part," On July 11, 2017, she said, "I'm feeling pretty good" (Exhibit 9F/26). She reported depression and anxiety at a level of 3/10, and she thought things were ok at home. She helped her husband with his work and had less stress. On July 24, 2017 the claimant reported she was feeling content staying at home, but her husband was concerned her mood may deteriorate if she was bored, and they were therefore considering a plan for her to participate "in a variety of fulfilling activities" (Exhibit 9F/57). On August 22, 2017, she reported, "for the most part I am pretty well," although still with days when she felt sad, depressed, and crying (Exhibit 9F/24). On September 26, 2017, her "Chief Complaint" was, "I'm good" and her progress was also "I'm good. . . I had more good days. . . 3 days in 30 days were bad days." On Mental Status Examination, she was dressed appropriately, alert, and oriented, with speech normal but monotone, reporting overall feeling much better, laughing joking, and going to yoga saying, "I'm starting to do things now" (Exhibit 9F/23).

On October 31, 2017, the claimant reported "The last couple days have been pretty normal," no crying or extra anxiety (Exhibit 9F/21). She was dressed appropriately, alter and oriented, and speech was good. She stated, "I still want less depression and more happy." She was going for walks, and taking yoga and bible studies. She complained of "some scary dreams" (Exhibit 9F/21). It was noted on November 1, 2017, that the claimant continued to be involved in a weekly yoga class. An 8-

week bible study course had recently ended and she was pursuing enrollment in a water fitness class, and considering a cooking class.

On November 15, 2017, the claimant presented to a nurse practitioner with symptoms of cough and congestion for 2 days. she was noted to be alert and fully oriented, with normal mood and affect (Exhibit 2F/4).

On December 12, 2017, the claimant reported, "I still do a lot of ups and downs," but "The last couple of days have been pretty normal, no crying, no extra anxiety" (Exhibit 9F/19). On Mental Status Examination, she was dressed appropriately, alert and fully oriented, with normal speech. She stated, "I still do a lot of ups and downs . . . . I had a traumatic week, very active, doing things. Now back to feeling depressed, withdrawal, stopped medications."

In February 2018, the claimant reported succeeding in managing emotional distress associated with trauma narratives shared during therapy and that goal was removed from her treatment plan. The addition of Lithium to her medication regimen eliminated the extreme mania and severe depression, and that objective was also removed from the treatment plan. There was also a slight improvement in her goal of increasing self-esteem (Exhibit 9F/65).

On June 19, 2018, the claimant reported feeling better since on Viibryd, with more energy, improved motivation, and depression at 6-7/10. Prazocin was helping her anxiety and nightmares. She reported, "I'm going to Texas tomorrow" (Exhibit 9F/14). On Mental Status Examination, her affect was appropriate, she was neat, alert, and fully oriented, with appropriate affect and no suicidal or homicidal ideation. On August 9, she reported thoughts of hurting herself, although one week alter said, "I'm better than last Thursday (Exhibit 9F/13). On September 11, 2018, she reported, "I'm feeling good," with sleep better, mood stable, less depression, and less anxiety (Exhibit 9F/7). On Mental Status Examination, her appearance was neat, speech normal, affect appropriate, and mood reported as "I'm feeling good."

On December 8, 2018, the claimant stated, "I'm okay" (Exhibit 9F/5). Her appearance was neat, speech normal, affect full range, and mood

"Okay." She still complained of mood swings, with crying and "ups and downs" a lot. She reported being more anxious, with problems with concentration. Her Geoden was increased. On January 9, 2019, the claimant reported slight regression in her progress with increasing confidence, attributing this to be the "severe periods of depression experienced during the past 4 months" (Exhibit 8F).

(Admin. Tr. 18-20). Plaintiff also summarized these same records in her brief. (Doc. 14, pp. 8-11).

    1.    Whether the ALJ Properly Discounted Plaintiff's Statements Made to Treatment Providers During Appointments

The Commissioner's regulations define "symptoms" as the claimant's own description of his or her impairment. 20 C.F.R. § 404.1502(i). The ALJ is not only permitted, but also required, to evaluate the credibility of a claimant's statements about all symptoms alleged and must decide whether and to what extent a claimant's description of his or her impairments may be deemed credible. In many cases, this determination has a significant impact upon the outcome of a claimant's application, because the ALJ need only account for those symptoms – and the resulting limitations – that are credibly established when formulating his or her RFC assessment. *Rutherford*, 399 F.3d at 554. To facilitate this difficult analysis, the Commissioner has devised a two-step process that must be undertaken by the ALJ to evaluate a claimant's statements about his or her symptoms.

First, the ALJ must consider whether there is an underlying medically determinable impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce the symptom alleged. 20 C.F.R. § 404.1529(b). If there is no medically determinable impairment that could reasonably produce the symptom alleged, the symptom cannot be found to affect the claimant's ability to do basic work activities. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029.

Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms which can be reasonably attributed to a medically determinable impairment. 20 C.F.R. § 404.1529(c)(1). Symptoms will be determined to reduce a claimant's functional capacity only to the extent that the alleged limitations and restrictions can reasonably be accepted as consistent with objective medical evidence and other evidence of record. 20 C.F.R. § 404.1529(c)(4). However, an ALJ will not reject statements about the intensity, persistence, or limiting effects of a symptom solely because it is not substantiated by objective evidence. 20 C.F.R. § 404.1529(c)(3). Instead, the ALJ will evaluate the extent to which any unsubstantiated symptoms can be credited based on the following factors: the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; any factor that precipitates or aggravates the

claimant's pain or other symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her pain or other symptoms; any treatment, other than medication, the claimant receives or has received for relief of his or her pain or other symptoms; any measures the claimant uses or has used to relieve his or her pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and any other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3);.

An ALJ's findings based on the credibility of a claimant are to be accorded great weight and deference, since an ALJ is charged with the duty of observing a witness's demeanor and credibility. *Frazier v. Apfel*, No. 99-CV-715, 2000 WL 288246, at *9 (E.D. Pa. Mar. 7, 2000) (*quoting Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). An ALJ is not free to discount a claimant's statements about his or her symptoms or limitations for no reason or for the wrong reason. *Rutherford*, 399 F.3d at 554.

The ALJ provided the following summary of Plaintiff's statements in his decision:

> The claimant alleges disability due to bipolar I, PTSD, depression, anxiety, hypertension, and thyroid condition, and states that she stopped working on February 20, 2017 because of her conditions and because of other reasons, saying she was let go due to inconsistent/missing work

(Exhibit 3E/2-3). She completed the 12th grade in regular education classes. She performed work the vocational expert classified as skilled and semi-skilled. In her Function Report, she alleged trouble going out in public and interacting with people, uncontrollable crying, and no drive/desire (Exhibit 4E). She takes care of pets, feeding them and taking them outside, noting that one dog is her service dog. No one helps her take care of the animals. She has no problem with personal care and does not need help or reminders to take her medication, except using a daily container to make sure she takes them.

The claimant prepares simple meals daily "when she feels up to it," stating she sometimes would rather not cook. She cleans, does laundry, weeds and washes dishes again "only when [she] feel[s] up to it, a few hours a week and weekly." She goes outside on her property daily. She drives or rides in a car. When asked if she goes out alone, she answered, "no," explaining she takes her service dog with her due to crowds, anxiety, and PTSD. She shops by computer so she does not need to leave her house, or goes to stores very quickly. She is able to pay bills, count change, handles a savings account, and use a checkbook/money orders. She state she does not spend time with others, but goes to church and the grocery store regularly. She reports her impairments affect her ability to concentrate and remember and says she can pay attention for only 10 minutes and does not finish what she starts.

The claimant appears at the hearing with her service dog, which she testified was prescribed by her psychiatrist Alida Covaci, M.D. for PTSD in November 2016. She testified she cannot work, because she was diagnosed with PTSD and bipolar disorder and has "episodes" and panic attacks that do not allow her to leave her home or last away from home for long periods of time. She did not have these prior to the alleged onset date. She has a driver's license with no limitations, and drives to the doctor weekly, but said she cannot drive wherever she would like or for a long time, due to fear and the PTSD. She testified lost [sic] her last job because she could not show up on a regular basis, due to episodes that would sometimes last a week, testifying the episodes include uncontrollable crying, panic, and fear.

The claimant testified she can follow movies, but does not get on the internet much because she heard Facebook can cause depression. She spends time with her grandchildren 3-4 times a month, but always with her husband or their parent present. She goes to the store with her dog, taking about 20-30 minutes, and goes to church about 3 times a month with her husband. When asked if she could do a simple job, such as a greeter-type job, she replied, "no, because of the public," which puts in her "an immediate panic attack." when asked if she could do a job with no public contact and little interaction otherwise, she responded that she could not because she would have her panic attacks, which would not allow her to show up.

(Admin. Tr. 16-17). Plaintiff does not identify which statements were improperly discounted by the ALJ. The primary limitations established by this testimony, however, appear to be social interaction limitations, and concentration problems.

In his decision, the ALJ found that based on the medical records summarized in his decision (reproduced in section IV.B. of this opinion):

the claimant does have severe mental impairments, which have been variously diagnosed as post-traumatic stress disorder (PTSD); depressive disorder; anxiety disorder; and bipolar disorder. However, her treatment has been rather conservative, with medication and therapy only. She has not been hospitalized for any mental condition, or be in intensive inpatient or outpatient treatment. Further, this conservative treatment appears to have been effective, although there have been times of greater symptoms, with trying different medications. Even during the times of greatest reported distress, however, the claimant was consistently alert and fully oriented (Exhibits 9F/2, 19, 21); dressed and appropriately and well groomed (Exhibits 9F/2, 19, 21), with normal speech (Exhibits 9F/5, 7, 19, 21, 23). Her mood was reported as normal, stable, good, and okay (Exhibits 2F/4, 7; 9F/13; 9F/7; and 9F/5, 7, respectively). In the only mention of memory in the record, the claimant's cognitive memory was described as "good," by her psychiatrist, with insight and judgment "fair" (Exhibit 9F/4).

> On two occasions, where the claimant needed to see a less familiar provider for a medical problem, there were no mental symptoms noted. In March 2017, she was alert and fully oriented, with normal mood and affect. Her behavior was normal, as was her judgment and thought content. She was in no distress (Exhibit 2F/7). On November 15 2017, she was noted to be alert and fully oriented, with normal mood and affect (Exhibit 2F/4). During the relevant time, the claimant was able to drive, go to the store, and attend church, bible study, and yoga classes. In April 2017, she was "currently transitioning to a new role in her husband's company," later reporting helping her husband with his work.

(Doc. 20, p. 20).

> Plaintiff argues:

> While the ALJ partially details the Claimant's testimony and evidence filed of-record, he nevertheless, essentially found her to be less than credible. (*See e.g.,* R. 17) (where the ALJ states that Claimant's allegation of her symptoms "are not entirely consistent with the medical evidence and other evidence in the record . . . ." In light of the above record analysis and medical opinions, this finding is unsupported. Instead, the Claimant's statements due to her mental health conditions are well supported.

(Doc. 14, pp. 11-12).

Despite discounting the extent of the limitations attested to by Plaintiff, the ALJ did incorporate restrictions to address a deficit in concentration (a limitation to simple, routine tasks, with only occasional changes in the work setting), and social limitations (no interaction with the public and only occasional interaction with co-workers and supervisors). Assuming that Plaintiff is arguing that the ALJ's erred by

discounting the extent of the social and concentration limitations attested to by Plaintiff, I am not persuaded.

After reviewing the ALJ's summary of the records, Plaintiff's summary of the records, and the records themselves, I find that the ALJ's decision that Plaintiff would be able to tolerate occasional (two hours per day or less) contact with co-workers and supervisors, and would be able to maintain enough concentration to perform simple routine tasks is supported by the record.

2. Whether the ALJ Properly Discounted Dr. Covaci and LCSW Francis-Werner's Co-Authored Opinion

On October 4, 2017 and November 27, 2018, treating Licensed Clinical Social Worker Debra L. Francis-Werner wrote letters. (Admin. Tr. 268-69, 287). Treating psychiatrist, Dr. Covaci, signed the second letter. Also on November 27, 2018, these two treating sources co-authored a check-box evaluation of whether Plaintiff met listing 12.15, and a check-box medical source statement. (Admin. Tr. 287-292; Doc. 13-7, pp. 54-59).

In the listing-type assessment, Dr. Covaci and LCSW Francis-Werner evaluated whether Plaintiff met listing 12.15 of the listing of impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1. In that assessment, Dr. Covaci and LCSW Francis-Werner assessed that Plaintiff met the paragraph A, B, and C criteria of that listing. (Admin. Tr. 291-292; Doc. 13-7, pp. 58-59).

In their check-box medical source statement, Dr. Covaci and LCSW Francis-Werner responded to questions asking them to rate Plaintiff's ability to perform certain activities based on the following scale: excellent (ability is not limited); good (can function satisfactorily 2/3 of the time); fair (can function satisfactorily 1/3 of the time); and poor (no useful ability to function). Dr. Covaci and LCSW Francis-Werner did not rate Plaintiff's ability to perform any activity as "excellent." Dr. Covaci and LCSW Francis-Werner assessed that Plaintiff had "good" ability to engage in the following activity: adhere to basic standards of neatness and cleanliness. Dr. Covaci and LCSW Francis-Werner assessed that Plaintiff had "fair" ability to engage in the following activities: remember locations and work like procedures; understand and remember short, simple instructions; carry out short, simple instructions; work with, or near others without being distracted by them; interact appropriately with the public; get along with co-workers and peers; and be aware of normal hazards and take appropriate precautions. Dr. Covaci and LCSW Francis-Werner assessed that Plaintiff had "poor" ability to engage in the following activities: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision; make simple work-related decisions;

Page 21 of 42

complete a normal workday or workweek; perform at a consistent pace; ask simple questions and request assistance; accept instructions and respond appropriately to criticism and supervisors; maintain socially appropriate behavior; respond appropriately to changes in the work setting; and travel in unfamiliar places or use public transportation. In the same opinion, Dr. Covaci and LCSW Francis-Werner wrote: "at this time Jennifer seems to struggle with everyday living demands. Her residual functioning has been increasingly poor and has begun to impact her daily life with even simple life decisions related to grocery shopping or going to a restaurant that is unfamiliar. She sometimes cries all day and cannot seem to manage her emotions regularly." (Admin. Tr. 290; Doc. 13-7, p. 57).

In his decision, the ALJ found that this opinion was not persuasive. Specifically he explained:

> the extreme limitations [in the listing assessment] are not supported by these providers' own treatment records and are inconsistent with the other medical evidence of record (Exhibit 7F). The sole area in which the providers found the claimant had a good ability was in the ability to adhere to basic standards of neatness and cleanliness. The many "poors" are inconsistent with the observations that the claimant was consistently alert and fully oriented (Exhibits 2F/4, 7; 9F/2, 14, 19, 21); with normal speech (Exhibits 9F/5, 7, 19, 21, 23); and mood reported as normal, stable, good, and okay (Exhibits 2F/4, 7; 9F/7; and 9F/5, 7 respectively).

> Other inconsistencies include (but are not limited to) the providers' opinion that the claimant would have an extreme limitation in understanding, remembering or applying information, which is

inconsistent with the only mention of cognitive memory in the record, where it was described as "good," by her psychiatrist, with insight and judgment "fair" (Exhibit 9F/4). This limitation as well as the opinion that the claimant has a poor ability to make simple work-related decisions, also appears inconsistent with providers' own opinion that the claimant would be able to manage benefits in her own best interest. Their opinion that the claimant has a poor ability to ask simple questions or request assistance is inconsistent with her visits to two less familiar providers, once for a mole on her back, and once for URI symptoms (Exhibits 2F/7 and 2F/4).

(Admin. Tr. 21; Doc. 13-2, pp. 22-23). The ALJ also found that the letters did not qualify as medical opinions and did not evaluate them for persuasiveness, but did consider them as evidence. *Id.*

The Commissioner's regulations define a medical opinion as "a statement from a medical source about what [a claimant] can still do despite [his or her] impairment(s) and whether [he or she has] one or more impairment-related limitations or restrictions in the following abilities:"

(i)     [The] ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);

(ii)    [The] ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

(iii)   [The] ability to perform other demands of work, such as seeing, hearing, or using other senses; and

(iv)   [The] ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. § 404.1513(a)(2). A "medical source" is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State of Federal Law, or an individual who is certified by a States as a speech-language pathologist or a school psychologist acting within the scope of practice permitted under State or Federal law. 20 C.F.R. § 404.1502(d). If one medical source submits multiple medical opinions, and ALJ will articulate how he or she considered the medical opinions from that medical source in a single analysis. 20 C.F.R. § 404.1520c(b)(1).

An ALJ's consideration of competing medical opinions is guided by the following factors: the extent to which the medical source's opinion is supported by relevant objective medical evidence and explanations presented by the medical source (supportability); the extent to which the medical source's opinion is consistent with the record as a whole (consistency); length of the treatment relationship between the claimant and the medical source; the frequency of examination; the purpose of the treatment relationship; the extent of the treatment relationship; the examining relationship; the specialization of the medical source and

any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1520c(c).

The most important of these factors are the "supportability" of the opinion and the "consistency" of the opinion. 20 C.F.R. § 404.1520c(b)(2). The ALJ will explain how he or she considered the "supportability" and "consistency" of a medical source's opinion. The ALJ may, but is not required to, explain his or her consideration of the other factors unless there are two equally persuasive medical opinions about the same issue that are not exactly the same. 20 C.F.R. § 404.1520c(b)(3). Unlike prior regulations, under the current regulatory scheme, when considering medical opinions, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c(a).

Plaintiff argues:

[T]he ALJ found that the statements on their opinion forms were "not supported by these providers' own treatment records." (*Id.* at 21.) To support this rationale, the ALJ merely sites to sporadic notes here and there that suggest that the Claimant is doing well or making progress. The ALJ points to a handful of records which show that the Claimant's "mood reported as normal, stable, good, and okay." (*Id.* a[t] 21.)

Indeed, the Third Circuit has repeatedly rejected ALJs' denial decisions where such decisions are based upon more routine medical notes and comments. Routine medical findings, in light of other more significant

findings, do not constitute substantial evidence supporting a denial. So, too, a finding that a claimant is "fine" or "normal" in an office setting may be and often is not reflective of a person's ability to engage in the rigors of full time employment on a regular and consistent basis. This is particularly true in mental health-based claims. Thus, the Third Circuit observed that, "For a person, such as [claimant], who suffers from an affective or personality disorder marked by anxiety, the work environment is completely different from home or a mental health clinic. [The doctor's] observations that [claimant] is "stable and well controlled with medication" during treatment does not support the medical conclusion that [claimant] can return to work." *Morales v. Apfel*, 225, F.3d 310, 319 (3d Cir. 2000). Likewise, for similar reasons, the Third Circuit again found that the ALJ improperly discredited a longtime treating physician's opinion merely "because of notations that [claimant's] condition was "stable" and "controlled." *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 357 (3d Cir. 2008). Hence, the Court found that "the ALJ's decision to discredit [the doctor] was not supported by substantial evidence." *Id.* While there are undoubtedly notes that show Claimant is better at times, there are also notes that show how she continues to struggle. For every step she may take forward, she may then take 1 or 2 steps back. This is the nature of her bipolar condition. The question is whether she is well enough to regularly and consistently engage in SGA. A proper understanding of the records in their entirety shows that this is not the case.

(Doc. 14, pp. 7-8).

In response, the Commissioner argues:

The ALJ correctly observed that Dr. Covaci and Ms. Francis-Werner's conclusory check-mark opinion was not supported by their own treatment records (Tr. 21). Conversely, inconsistent with the numerous checkmarks indicating that Plaintiff had "poor" *i.e.*, no useful ability to function, in many work-related areas, the ALJ explained that Dr. Covaci and Ms. Francis-Werner generally documented unremarkable mental status examinations (Tr. 21, 288-90). The ALJ cited, for example, Dr. Covaci and Ms. Francis-Werner's findings that Plaintiff was consistently alter and fully oriented, displayed normal speech,

appropriate affect, and mood ranged from okay to good. (Tr. 21, 299-301, 303, 309-11, 315, 317, 320).

Not only was the opinion not well supported, the ALJ explained that Dr. Covaci and Ms. Francis-Werner's opinion was inconsistent with other substantial evidence of record (Tr. 21). The ALJ cited, for example, that their unduly restrictive assessed limitations in Plaintiff's ability to understand, remember, or apply information was inconsistent with Plaintiff's cognitive examination, demonstrating good memory and fair insight and judgment, without deficiencies noted in these areas on examination elsewhere in the record (Tr. 21, 300). Further, the ALJ explained that their opinion that Plaintiff had poor ability to ask simple questions or seek assistance was inconsistent with Plaintiff's ability to seek help from less familiar providers for medical issues (including for supper respiratory symptoms and a problematic mole) (Tr. 21, 245, 248). In fact, at these appointments, Plaintiff's providers documented normal mental status examinations (Tr. 245, 248).

The regulatory emphasis on an opinion's consistency also implicates the degree to which the opinion is internally consistent with itself. The ALJ explained that Dr. Covaci and Ms. Francis-Werner's proffered limitations that Plaintiff had "poor" ability to make simple work-related decisions was inconsistent with their indication that Plaintiff was capable of managing her benefits in her own best interest (Tr. 21, 289-90[]).

The ALJ also noted inconsistency of Dr. Covaci and Ms. Francis-Werner's opinion with the prior administrative medical findings, which opined that Plaintiff was capable of meeting the basic mental demands of simple, routine tasks on a sustained basis (Tr. 21, 66-70). The ALJ appropriately found Dr. Small's opinion "supported by the overall record," including for example, Plaintiff's mental status examinations, conservative treatment history and improvement with treatment, and her daily activities such as handling her own finances and appointments, helping her husband with his work, and attending church, bible study, and yoga classes (Tr. 21, 237, 299-301, 303, 309-11, 313, 315, 317-20, 322-23, 325, 350, 361).

. . . .

Plaintiff also points to various subjective complaints she reported to Dr. Covaci and Ms. Francis-Werner documented in their treatment notes as support for their opinion. However, the ALJ addressed this evidence. Addressing Plaintiff's subjective complaints, the ALJ explained, "[T]here have been times of greater symptoms, with trying different medications. Even during the time of greatest reported distress[;] however, [Plaintiff] was consistently alert and fully oriented [ ]; dressed appropriately and well groomed [ ] with normal speech [ ]. Her mood was reported as normal, stable, good, and okay [ ]. In the only mention of memory in the record, [Plaintiff]'s cognitive memory was described as 'good,' by her psychiatrist, with insight and judgment ;fair'" (Tr. 20, 299-301, 303, 309-11, 315, 317, 320). Stated differently, the ALJ considered Plaintiff's variable subjective complaints and found that they were not entirely substantiated by Plaintiff's mental status examinations, which consistently showed unremarkable findings (Tr. 16-20).

In any event, the fact that Plaintiff can point to select complaints does not override the substantial evidence cited by the ALJ discussed above. To override the agency's factual finding, it is not enough that Plaintiff points to evidence that "supports" a contrary conclusion: the evidence must "*compel*[ ]" it. *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) (emphasis original). These isolated complaints, considered by the ALJ, do not compel reversal here. Accordingly, the Court should affirm.

(Doc. 16, pp. 22-24).

In support of her position, Plaintiff relies on two cases *Morales v. Apfel*, 225

F.3d 310 (3d Cir. 2000) and *Brownawell v. Comm'r*, 554 F.3d 352 (3d Cir. 2008).

In *Morales*, the Third Circuit held that an ALJ improperly discounted treating source

Page 28 of 42

opinions based on his own speculation, and notations in treatment records that the claimant was "stable" with medication. In doing so, the Circuit explained:

> Nor was is proper for the ALJ to reject Dr. Erro's opinion based on Dr. Erro's notation that Morales was stable with medication. The relevant inquiry with regard to disability determination is whether the claimant's condition prevents him from engaging in substantial gainful activity. *See* 42 U.S.C. § 423(d)(1)(A). For a person, such as Morales, who suffers from an affective or personality disorder, marked by anxiety, the work environment is completely different from home or a mental health clinic. Dr. Erro's observations that Morales is "stable and well controlled with medication" during treatment does not support the medical conclusion that Morales can return to work. Dr. Erro, despite his notation, opined that Morale's mental impairment rendered him markedly limited in a number of relevant work-related activities. Other information in the treatment records supports this opinion. Thus, Dr. Erro's opinion that Morales's ability to function is seriously impaired or nonexistent in every area related to work shall not be supplanted by an inference gleaned from treatment records reporting on the claimant in an environment absent the stresses that accompany the work setting.

*Morales*, 225 F.3d at 319.

In *Brownawell*, the Circuit concluded that an ALJ's decision to discount a treating source's assessment of a claimant's headaches based on notes that the headaches were stable, under control, and responded to medications. The Court concluded that the ALJ's rationale was not supported by the record because:

> The ALJ asserts that "Dr. Grem specifically stated in the treatment notes dated March 29, 2004 that the claimant's headaches alone are not enough for disability . . . . Grem [later refused to complete disability forms because the] headaches were not debilitating and the claimant needed to get a psychiatric opinion for her depression impairment which had been reported as stable." *A.R.* at 303. This reasoning is

wholly unsupported by the record, which shows that Brownawell did not visit Dr. Grem after 2003. The treatment notes to which the ALJ refers were made while Brownawell was visiting another doctor and, with respect to the "headaches alone are not enough for disability" notation, appear to have been taken by a nurse, not a doctor. *A.R.* at 544.

In rejecting Dr. Grem's opinion, the ALJ also claims that Brownawell's "longitudinal treatment records document either mild symptoms when at their worst or no symptoms at all when on medication . . . [and] contain no indication . . . of inability to function." The evidence does not support this proposition. In addition to the previously discussed statements from Dr. Grem, including the letter stating that Brownawell is bedridden about four days a week, medical records reflect that Brownawell's migraines were of such a severity that she twice had to visit the emergency room—once on November 14, 2000 and again on May 13, 2001—to receive intravenous medication. *A.R.* at 208-215 (records from first ER visit), 222-228 (records from second ER visit).

*Brownawell*, 554 F.3d at 356 (internal footnote omitted).

I am not persuaded that the Third Circuit's holdings in *Morales* or *Brownawell* compel remand in this case. In her argument, Plaintiff does not specify which limitations were improperly discounted. However, in another section of her brief, she suggests that additional limitations should be imposed for the following activities: understanding and remembering simple instructions; making simple work-related decisions; need for special supervision; inability to complete a normal workday or perform at a consistent pace; inability to adapt to changes; and inability to interact with the public, coworkers, supervisors, or maintain socially appropriate behavior. In these areas, the ALJ limited Plaintiff to: simple, routine tasks;

occasional (from very little to 1/3 of the time) changes in the work setting; no interaction with the public; and only occasional (from very little to 1/3 of the time) interaction with supervisors and coworkers.

In support of the rejection of aspects of the opinion related to social limitations and ability to adapt to changes, the ALJ noted that Plaintiff was attending weekly yoga classes, weekly bible study, church, and was considering additional social activities. This appears to support the ALJ's assessment of Plaintiff's social and adaptive limitations. Similarly, Plaintiff's social activities outside the home do not appear to be consistent with the treating sources' limitation and Plaintiff's testimony that any work would trigger panic attacks. Although the record does suggest that there was a two week period in August 2018 where Plaintiff experienced significant symptoms, and that her husband felt it was necessary to stay home with her, the ALJ specifically considered this evidence. This one-time exacerbation does not support the treating sources' assessment that Plaintiff would always require special supervision. The ALJ supported his assessment by citing to a treatment record suggesting that Plaintiff's memory was "good." Neither Plaintiff nor the Commissioner mention any treatment record that discusses any clinical observation of distractibility or lack of focus. Thus, the ALJ's assessment appears to be supported by some evidence.

C.   WHETHER THE ALJ PROPERLY EVALUATED THE TREATMENT RELATIONSHIP FACTORS WHEN CHOOSING BETWEEN THE COMPETING MEDICAL OPINION FROM DR. SMALL AND DR. COVACI/ LCSW FRANCIS-WERNER

On January 3, 2018, psychologist Richard Small ("Dr. Small") issued a psychiatric review technique ("PRT") assessment, and mental RFC assessment as part of the initial review of Plaintiff's application. (Admin. Tr. 66-70; Doc. 13-3, pp. pp. 5-9). In the PRT assessment, Dr. Small assessed that Plaintiff had medically determinable impairments that did not meet the diagnostic criteria of listing 12.04 (depressive, bipolar, and related disorders) or 12.15 (trauma and stressor-related disorders).  When he evaluated the paragraph B criteria of these listings, Dr. Small found that Plaintiff's mental impairments resulted in: mild difficulty understanding, remembering or applying information; moderate difficulty interacting with others; mild difficulty concentrating, persisting or maintaining pace, and moderate difficulty adapting or managing oneself. *Id.*

In the check-box mental RFC assessment, Dr. Small assessed that that Plaintiff was "moderately" limited in the following areas: interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; and responding appropriately to changes in the work setting. *Id.* Dr. Small assessed that Plaintiff had no understanding and memory

limitations, and no sustained concentration and persistence limitations. *Id.* In support

of this assessment, Dr. Small explained:

> The claimant is a 46-year old woman with a high school degree who
> has worked as a manager, clerk and project coordinator. She receives
> medication and counseling for longstanding issues, which are
> improving. She has a service dog which has allowed her to engage
> increasingly in the community.

> She is in a positive marital relationship but is still prone to depression.

> There is no [medical source opinion]

> She did not provide [activities of daily living], but clinical record does
> not suggest limits in doing basic tasks. Based on the evidence of record,
> the claimant's statement are found to be partially consistent with the
> evidence.

> The claimant is able to meet the basic mental demands of simple,
> routine tasks on a sustained basis despite the limitations resulting from
> the impairment.

> These findings complete the medical portion of the disability
> determination.

(Admin. Tr. 69; Doc. 13-3, p. 8).

In his decision the ALJ found that Dr. Small's opinion was "persuasive." In

doing so, the ALJ explained:

> The undersigned finds the mental residual functional capacity
> submitted by State agency consultative psychologist Richard Small,
> Ph.D. persuasive (Exhibit 1A). Sr. Small's opinion is supported by the
> overall record. He had access to the case file, as it was comprised on
> the day he reviewed it, and his report indicates a full review of that file.
> Information received after his review appears quite consistent. In
> particular, his opinion that the claimant is capable of meeting the basic

mental demands of simple, routines tasks on a sustained basis is consistent with the claimant's rather conservative treatment, with medication and therapy only and no intensive inpatient or outpatient treatment; her apparent improvement with that conservative treatment; her ability to handle her own finances, help her husband with his work, and go to appointments as well as church, bible study, and yoga classes. Nevertheless, the undersigned has included a limitation on interaction with the public. This does not reflect any fallacy with the State agency consultant's reasoning, but rather is a function of according the claimant the utmost benefit of the doubt.

(Admin. Tr. 21; Doc. 13-2, p. 22).

The co-authored opinion of Dr. Covaci and LCSW Francis-Werner, and the ALJ's evaluation of that opinion, is summarized in Section IV. B. 2. of this opinion. *supra* pp. 20-32.

Plaintiff argues:

In determining the persuasiveness of medical opinions, the ALJ must consider both the supportability and consistency of the medical evidence as well as the treating source's relationship with the Claimant and their area of specialization, if any. (20 C.F.R. § 404.1520c(c).) For the "relationship with the claimant" analysis, the regulations require that the following be given due consideration: (i) length of treatment relationship, (ii) frequency of examinations, (iii) purpose of treatment relationship, (iv) extent of the treatment relationship, and (v) examining relationship. (20 C.F.R. § 404.1520c(c)(3).) In looking at each of these 5 factors, it is evidence that Dr. Covaci's opinions are well-supported, consistent and, therefore, very persuasive. First, Dr. Covaci's practice, New Horizons Counseling Services, Inc., saw Claimant over a long period of time. Treatment at New Horizons Counseling Services, Inc. began well before the AOD and continued until the time of the hearing. The record shows that the Claimant was treating at New Horizons as of at least August 29, 2016 and had regular and continuous treatment right up to January 9, 2019, just a few weeks before the February 2019

hearing. (*Id.* at 297-384.) Second, as to frequency, the record shows that Claimant has seen Dr. Covaci at least 23 times between September 26, 2016 and December 8, 2018, at the rate of about one visit every month. (*Id.* 297-384.) The Claimant has also seen a therapist MSW, LCSW, Ms. Francis-Werner, at New Horizons for counseling for at least 10 visits during the same period. Hence, in total, the Claimant has had **no fewer than 33 visits** with the mental health professionals at New Horizons. Third, the purpose of the relationship was mainly for mental health care. Dr. Covaci is a mental health specialist as is therapist Ms. Francis-Werner. Therefore, Dr. Covaci has a higher level of knowledge than, say, a family physician. Fourth, the extent of the treating relationship is such that Dr. Covaci had the opportunity to become intimately familiar with the Claimant as a person. Dr. Covaci was able to, and did, manage Claimant's mental health medication for over 2 years. Dr. Covaci directly saw the effects of Claimant's progress (or lack thereof) and response to medication, therapy, coping skills and the like. Fifth, Dr. Covaci had an examining relationship with the Claimant. In this way, Dr. Covaci had a "better understanding of [her] impairment(s)" than a "medical source [who] only reviews evidence," such Richard Small, Ph.D., discussed below. (20 C.F.R. § 404.1520c(c)(3).)

Then, in terms of the "specialization" factor, Dr. Covaci, as noted, was a mental health specialist, thus helping to make her opinion "more persuasive about medical issues . . . than" the medical opinion of someone "who is not a specialist in the relevant specialty." (20 C.F.R. § 404.1520c(c)(4).) Here, the ALJ found "persuasive" (though not "very persuasive") the opinion of Richard Small, Ph.D. (*Id.* at 21.) His opinion was provided on January 3, 2018. (*Id.* at 67.) When reviewing the factors regarding to which opinions a persuasive finding should be made (20 C.F.R. § 404.1520c(c)), these factors mitigate *against* the opinion of Dr. Small. This is particularly the case in the area of "relationship with the claimant." (20 C.F.R. § 404.[1520]c(c)(3).) Indeed, in looking at the 5 factors of § 404.1520c(c)(3), Dr. Small: (i) had no relationship with the Claimant, (ii) did not conduct frequent exams, (iii) had no treating relationship based on mental health specifically, (iv) did not order any tests, prescribe medication and/or observe the effectiveness of lack thereof upon the claimant over time,

and (v) did not conduct any exam. Additionally, because his opinion occurred more than a year before the hearing, he only conducted a very limited records' review. Indeed, it appears Dr. Small **only saw 1 of 33 mental health visit notes (i.e., 3% of the total record).** He only reviewed one medical record received from New Horizons Counseling at the time he rendered his opinion. (*Id.* at 65.) When he rendered his opinion, only Exhibits 1F (R. 235-241) and 2F (R. 242-265) were a part of the record. Of these two, only Exhibit 1F is from New Horizons Counseling and that, as indicated, only contained one note of mental health treatment for a visit on 11/1/17, of the 33 total visits that eventually became part of this final record. Indeed, Exhibit 9F (R. 297-396), which reflects the mental health records from August 29, 2016 through January 9, 2019, was not added into the record until on or about February 21, 2019, when it was electronically filed by the Claimant. Hence, it is extremely difficult to understand how a non-treating records' reviewer could form a reasonable opinion, let alone one that is found to be persuasive, after looking at only *one record*, over and against a treating source that saw the individual 33 times over a two year period.

(Doc. 14, pp. 3-6).

In response, the Commissioner argues:

[T]he revised regulations have eliminated any deference to the source of an opinion (*e.g.*, he "treating source rule") and further explain that ALJs will not provide any specific evidentiary weight to any medical opinion. 82 Fed. Reg. at 5853; 20 C.F.R. § 404.1520c(a). As the agency explained, since the medical opinion regulations were last revised in 1991, healthcare delivery has changed in significant ways, and the agency's adjudicative experience has shown that the source of an opinion is not the most important factor for determining the persuasiveness of the opinion. *Id.*

In evaluating claims filed March 27, 2017 or later, the agency "will not defer of give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources."

20 C.F.R. § 404.1520c(a). Instead, the ALJ will evaluate the persuasiveness of a medical opinion or prior administrative medical finding using several factors. The ALJ must explain how he considered the factors of supportability and consistency, which are the two most important factors in determining the persuasiveness of a medical source's medical opinion or a prior administrative medical finding. 20 C.F.R. § 404.1520c(b)(2). The ALJ is not required to explain how he considered the other factors. *Id.*.

Thus, contrary to Plaintiff's argument, the opinion of Dr. Covaci and Ms. Francis-Werner did not warrant enhanced deference under regulations applicable to this case. Moreover, Plaintiff focuses on the sources' relationship to her, the length and frequency of treatment, and specialization. However, the revised regulations are clear "[t]he factors of supportability and consistency are the most important factors we consider when we determine how persuasive we find a medical source's medical opinion or prior administrative medical findings to be." 20 C.F.R. § 404.1520c(b)(2).

(Doc. 16, pp. 17-19) (internal footnotes).

In her reply brief, Plaintiff clarifies that it is not a lack of explanation, but rather a lack of *consideration* of the treatment relationship factors that requires remand. There appears to be no dispute that the ALJ did not provide any explanation as to whether the "treatment relationship" factors weighed in favor or against the persuasiveness of any opinion, and that under the applicable regulation the ALJ was not required to do so. Although the 2017 change in regulation relieved the Commissioner of her obligation to explain how the treatment relationship factors are weighed in some circumstances, it did not relieve the more general obligation to provide enough information to permit judicial review.

Page 37 of 42

In *Cotter v. Harris*, the Third Circuit recognized that there is "a particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record." 642 F.2d 700, 706 (3d Cir. 1981). In defining the parameters of this obligation, the Circuit explained:

> [i]n our view and examiner's findings should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so that a reviewing court may know the basis for the decision. This is necessary so that the court may properly exercise its responsibility under 42 U.S.C. § 405(g) to determine if the Secretary's decision is supported by substantial evidence.

*Id.* at 705 (quoting *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974). In its opinion denying a rehearing in *Cotter*, the Circuit further elaborated that "in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481 (3d Cir. 1981).

To the extent Plaintiff suggests that more explanation is required in this case to demonstrate that the ALJ *considered* the treatment relationship factors, as he is required to do (even if he is not required to explain it), I am not persuaded. In his decision, the ALJ's provides enough information to show that the treatment relationship factors were considered. In his opinion the ALJ states that he "considered the medical opinion(s) and prior administrative findings in accordance with the requirements of 20 CFR 404.1520c." (Admin. Tr. 16). The ALJ also refers

to Dr. Covaci as "her [claimant's] psychiatrist" and provided a detailed summary of the treatment records from LCSW Francis-Werner and Dr. Covaci. Furthermore, the ALJ's decision includes enough explanation for the Court to discern why the treating source opinion was found less persuasive. Accordingly, I find that remand is not required for the ALJ to explain his evaluation of the treatment relationship factors in this case.

D. WHETHER THE ALJ INCORPORATED ALL OF PLAINTIFF'S CREDIBLY ESTABLISHED LIMITATIONS IN THE RFC ASSESSMENT

One oft-contested issue in this setting relates to the claimant's residual capacity for work in the national economy. As discussed above, a claimant's RFC is defined as "the most [a claimant' can still do despite [his or her] limitations," taking into account all of a claimant's medically determinable impairments. 20 C.F.R. § 404.1545. In making this assessment, the ALJ is required to consider the combined effect of all medically determinable impairments, both severe and non-severe. 20 C.F.R. § 404.1545. Although such challenges most often arise in the context of challenges to the sufficiency of vocational expert testimony, the law is clear that an RFC assessment that fails to take all of a claimant's credibly established limitations into account is defective. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 n. 8 (3d Cir. 2005) (noting that an argument that VE testimony cannot be relied upon where an ALJ failed to recognize credibly established limitations during an RFC

assessment is best understood as a challenge to the RFC assessment itself); *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 147 (3d Cir. 2007) (noting that an ALJ must include in the RFC those limitations which he finds to be credible).

Moreover, because an ALJ's RFC assessment is an integral component of his or her findings at steps four and five of the sequential evaluation process, an erroneous or unsupported RFC assessment undermines the ALJ's conclusions at those steps and is generally a basis for remand.

Plaintiff argues:

> Based on the opinions of the vocational expert, *if any one* of the following are true with respect to the Claimant's ability to function, all employment is precluded: unable to understand, remember and carry out short, simple instructions, and make simple work-related decisions; needs special supervision; unable to complete a normal workday or perform at a consistent pace; unable to interact with the public or supervisors or coworkers; unable to maintain socially appropriate behavior; and have changes in the work setting. (R. 60-61) (vocational expert testimony). Both Dr. Covaci and therapist Francis-Werner opined that <u>all</u> of these restrictions were true of the Claimant. (R. 288-290.) Hence, if their opinion is correct as to any one of these issues, the Claimant is unable to sustained SGA. The Claimant maintains here, of course, that all of their opinions on these issues are accurate.

(Doc. 14, p. 13).

In response, the Commissioner argues:

> As discussed above, the ALJ was not bound by the opinion of Dr. Covaci and Ms. Francis-Werner, and the ALJ explained why he found the opinion not persuasive. *See supra* p. 16-24. Accordingly, the ALJ was not required to incorporate the unpersuasive proffered limitations

from that opinion when formulating Plaintiff's RFC and hypothetical question.

Rather, as required, the ALJ incorporated Plaintiff's work-related limitations that he found supported by the record as a whole (Tr. 16-21). In particular, the ALJ limited Plaintiff to mentally restrictive work that involved only simple, routine tasks performed in an environment with only occasional changes, no interaction with the public, and only occasional interaction with coworkers and supervisors (Tr. 16). The ALJ conveyed these RFC findings in the hypothetical question to the VE (Tr. 59). In response to the hypothetical question that fairly set forth Plaintiff's mental functional limitations supported by the record, the VE proffered jobs Plaintiff could perform in the national economy (Tr. 59-60). *See Plummer v. Apfel*, 186, F.3d 422, 431 (3d Cir. 1999) (the vocational expert's testimony in response to hypothetical question that fairly set forth every credible limitation established by the evidence was substantial evidence of non-disability). Accordingly, substantial evidence supports the ALJ's determination. This court should defer to the ALJ's fact-finding and affirm.

(Doc. 16, p. 25-26).

I am not persuaded by Plaintiff's argument that remand is required so that the discounted limitations set forth in the treating sources' opinion may be included in the ALJ's RFC assessment. For the reasons explained in Sections IV. B. & C. of this opinion, I find that those limitations were permissibly discounted by the ALJ. *See Sections IV. B & C, supra.*

[The next page contains the conclusion]

Page 41 of 42

V.    CONCLUSION

Accordingly, for the forging reasons:

(1)    The final decision of the Commissioner will be AFFIRMED.

(2)    Final judgment will be issued in favor of the Commissioner.

(3)    An appropriate order will be issued.

Date: March 7, 2022                    BY THE COURT

                                       *s/William I. Arbuckle*
                                       William I. Arbuckle
                                       U.S. Magistrate Judge